# United States Court Of Appeals
# for the
# Third Circuit

---

### CASE NO. 15-2355

---

BETANIA A. TORIBIO, ADMINISTRATRIX OF THE ESTATE OF JOHN JOAQUIN
TORIBIO, DECEASED, and BETANIA A. TORIBIO, INDIVIDUALLY

*Appellant*

- v. -

PINE HAVEN, LLC, doing business as PINE HAVEN CAMPGROUND
and PINE HAVEN CAMPING RESORT and DIVERSIFIED
INVESTMENTS, INC., a/k/a
DIVERSIFIED INVESTMENTS, LLC,
a/k/a DIVERSIFIED INVESTMENT SERVICES, LLC

*Appellees*

---

ON APPEAL FROM ORDERED ENTERED IN THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY, CAMDEN
AT NO. 1:12cv-04975-JEI-JS

---

### APPENDIX VOLUME II OF II (PAGES 4a-end)
### OF BEHALF OF APPELLANT

---

MANIACI, CICCOTTA & SCHWEIZER, LLP
*Attorney for Appellant*
385 Kings Highway North, Suite 105
Cherry Hill, NJ 08034
Phone: 856-321-9331
rciccotta@jgmlawoffice.com

*On the Brief:*
*RENO JOHN CICCOTTA*

# TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES……………………………………..ii

JURISDICTIONAL STATEMENT……………………………………… 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW……………. 2

STATEMENT OF THE CASE……………………………………….. 3

STATEMENT OF THE FACTS……………………………………… 4

LEGAL ARGUMENT…………………………………………… 6

    POINT I.  JUDICIAL BIAS AND PARTIALITY…………………….... 6

    POINT II.  FAILURE TO CHARGE THE JURY ON
            DUTY VOLUNTARILY ASSUMED…………………..…  31

CONCLUSION………………………………………………….. 36

CERTIFICATE OF BAR MEMBERSHIP…………………………….. 37

# TABLE OF CASES AND AUTHORITIES

## CASES

Ceneviva v. Homes, 2011 U.S. Dist. LEXIS 65061;
2011 WL 2470596……………………………………………………… 33

Evans v. Liberty Mutual Insurance Co., 398 F2d 665, 666-67
(3rd Cir. 1968)………………………………………………….... 32

Johnson v. Souza, 71 N.J. Super. 240, 176 A.2d 797, 798-99
(N.J. Super. Ct. App. Div. 1961)…………………………..…… 33

Liteky v. United States, 127 L.Ed.2d 474, 114 S. Ct. 1147, 1157 (1994)……. 7

Patterson v. United States, 413 F.2d 1001, 1003. (5th Cir. 1969)……………. 19

Pollard v. Fennell, 400 F.2d, 421, 423 (4th Cir. 1968)…………………………. 30

Sit-Set, A.G. v. Universal Jet Exchange, Inc., 747 F.2d 921, 926
(4th Cir. 1984)…………………………………………………… 7

Smith v. United States, 305 F.2d 197, 205 (9th Cir.), cert. denied,
371 U.S. 890, 9 L.Ed.2d 124, 83 S. Ct. 189 (1962)…………………………… 6

Thorne v. Miller, 317 N.J. Super. 554, 722 A.2d 626, 629
(N.J. Super. Ct. L. Div. 1998)…………………………………………… 33

Travelers Insurance Company v. Ryan, 416 F.2d 362, 364 (5th Cir. 1969)…… 8,19

United States v. Cole, 491 F.2d 1276, 1278 (4th Cir. 1974)……………………. 30

United States v. Cassiagnol, 420 F.2d 868, 879 (4th Cir. 1970)………………. 30

United States v. Dellinger, 472 F.2d 340, 386 (7th Cir. 1972),
cert. denied. 410 U.S. 970, 35 L.Ed. 706, 93 S. Ct. 1443 (1973)……………. 7

United States v. Head, 697 F.2d 1200 (4th Cir. 1982)…………………………... 31

United States v. Lanham, 416 F.2d 1140, 1143 (5th Cir. 1969)……………….. 8,9

United States v. Malcolm, 475 F.2d 420, 427 (9th Cir. 1973)……………….. 7,22

## **AUTHORITIES**

New Jersey Model Civil Charge 510.C
Undertaking Voluntarily Assumed……………………………………..    2

New Jersey State Sanitary Code N.J.A.C. 8:26………………………….  15,22

Restatement of Torts (Second) § 323…………………………………..    32

Restatement of Torts (Second) § 324A…………………………………    32

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1332, the United States District Court for the District of New Jersey had subject matter jurisdiction in the underlying matter, because the parties had diverse citizenship and the amount in controversy exceeded the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.  Appellate Jurisdiction is based on appeal from a final judgment in favor of appellees, Diversified Investments, Inc. and Pine Haven, LLC, against appellant, Betania A. Toribio, for no cause of action signed by the District Court on May 14, 2015.  The Notice of Appeal was filed on May 28, 2015.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The District Court erred by:

1. Unduly interfering with the conduct of the trial, thereby disrupting the proceedings, preventing the proper presentation of appellant's evidence and effectively preempting counsel's legitimate function in the adversarial process.

2. Demonstrating judicial and personal bias against appellant, appellant's counsel and appellant's evidence throughout the course of the trial, with constant and repeated interventions that extended well beyond a trial court's ordinary and necessary efforts at courtroom administration.

3. Excessively and aggressively cross-examining appellant's fact and expert witnesses, rehabilitating and validating appellees' witnesses and repeatedly commenting upon the quality of appellant's witnesses and evidence throughout the trial, thereby influencing the jury to appellant's detriment.

4. Rejecting appellant's proposed jury instruction based on New Jersey Model Civil Charge 510.C <u>Undertaking Voluntarily Assumed</u>.

## STATEMENT OF THE CASE

This is a civil action in tort arising from the alleged wrongful conduct of defendant, Pine Haven, LLC, and its agents in failing to provide safeguards and policies at their campground in Ocean View, New Jersey, which failure allegedly resulted in the drowning death of appellant's decedent, a minor, on August 8, 2010. Appellant instituted suit in her capacity as personal representative of the decedent's Estate and in her individual capacity as his mother.

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity among the parties and an amount in controversy which exceeds $75,000.00.

This matter was tried before the Honorable Joseph E. Irenas in the United States District Court for the District of New Jersey from May 4, 2015 through May 14, 2015.

The jury determined that defendant, Pine Haven, LLC, was 7% liable, but that appellant's decedent was 93% liable for his own drowning death.

## STATEMENT OF THE FACTS

On August 8, 2010, at approximately 8:15 p.m., the fourteen-year-old decedent, John Joaquin Toribio, drowned in a man-made "swimming lake" at the Pine Haven Campground in Ocean View, New Jersey. The minor decedent and several other minor friends had entered the lake that evening with unrestricted, unfettered access. No fencing or other barriers were present at the lake to deny or restrict access by campers or guests like the minor decedent and his friends to the body of water. No lifeguards or security personnel or representatives of campground management were present to observe and supervise the use of the lake by the minor decedent and his friends that evening. No surveillance cameras were fixed on the swimming lake. Although periodic patrols of the campground and swimming lake area were regularly conducted by campground management on Friday and Saturday evenings during the summer of 2010, those patrols were discontinued on Sunday evenings, including the evening of Sunday, August 8, 2010. Artificial lighting at the swimming lake failed to adequately illuminate the body of water, not only allowing the teenagers to enter the lake surreptitiously before the drowning, but complicating the search efforts to locate and retrieve the minor decedent's body after the drowning.

The campground actively promoted the use by teenagers and other children of other facilities and amenities positioned near the swimming lake including an arcade/game room, playgrounds, paddle boats, snack areas and basketball courts.

Soon after entering the lake at approximately 8:15 p.m. on August 8, 2010, the minor decedent started experiencing some difficulty in the water. When his two young companions did not see the minor decedent after some time had passed, they exited the lake to search for him and notify parents and other adults that he was missing. Called to the scene by parents and other adults, Dennis Township Fire Department personnel thereafter recovered the minor decedent's body from the bottom of the swimming lake approximately 35 feet from the "shore line" and in 15 feet of water. Artificial lighting at the lake was so deficient, other campers needed to drive their vehicles to the lake and fix their headlights on the water to aid the search for the body before the fire department arrived. The minor decedent, John Joaquin Toribio, was pronounced dead at the scene on August 9, 2010 at 1:42 a.m.

# LEGAL ARGUMENT

## POINT I: JUDICIAL BIAS AND PARTIALITY

The discussion set forth below will expose two general indiscretions committed by the District Court that stand out and are irrefutable bases for a new trial. One is the palpable advocacy revealed in the District Court's running commentary and questioning of appellant's fact and expert witnesses compared with the rehabilitative questioning of appellees' fact and expert witnesses throughout the trial. The other was the obvious condescension and "mocking" of appellant's fact and expert witnesses throughout the trial. This combination of advocacy and ridicule of appellant's witnesses left no doubt about the District Court's personal view on the ultimate issues of fact in the case. We must assume that the jurors were an attentive, respectful audience to the District Court's performance and were significantly influenced by it, thereby denying appellant a fair trial. That the jury would not second guess the District Court on the ultimate issues of fact was predictable and doomed appellant's case from the start.

Appellant acknowledges that "a federal trial judge...is more than a moderator or umpire. He has the responsibility to preside at trial in such a way as to promote a fair and expeditious development of the facts unencumbered by irrelevancies." Smith v. United States, 305 F.2d 197, 205 (9th Cir.), cert. denied, 371 U.S. 890, 9 L.Ed.2d 124, 83 S. Ct. 189 (1962). A federal trial judge may

properly participate in the examination of witnesses for the legitimate purposes of "clarifying the evidence, controlling the orderly presentation of the evidence, confining counsel to evidentiary rulings, and preventing undue repetition of testimony." United States v. Malcolm, 475 F.2d 420, 427 (9th Cir. 1973).

Appellant also acknowledges that remarks made by a federal trial judge must be highly prejudicial before they will be deemed to demonstrate judicial bias or partiality. In order for such remarks to support a bias or partiality challenge, they must reveal of "high degree of favoritism or antagonism" as to make fair judgment impossible. Liteky v. United States, 127 L.Ed.2d 474, 114 S. Ct. 1147, 1157 (1994). The remarks of a federal trial judge in the presence of a jury are subject to "special scrutiny" on a claim of bias or partiality in favor of one party over another. United States v. Dellinger, 472 F.2d 340, 386 (7th Cir. 1972), cert. denied. 410 U.S. 970, 35 L.Ed. 706, 93 S. Ct. 1443 (1973).

However, a federal trial judge may not engage in a course of judicial domination of the examination of witnesses in such a persistent manner throughout a trial, so as to preempt counsel's legitimate function in the adversarial process. Sit-Set, A.G. v. Universal Jet Exchange, Inc., 747 F.2d 921, 926 (4th Cir. 1984). A federal trial judge may not intervene incessantly during trial so as to disrupt counsel's presentation of evidence and convey an impression of partiality for one side's position over the other side's position. Sit-Set, A.G. at 926.

Although a federal trial judge need not be a passive observer at trial, he must not offer his views explicitly or implicitly upon ultimate issues of fact. Travelers Insurance Company v. Ryan, 416 F.2d 362, 364 (5th Cir. 1969). He may not take over the argument on behalf of one of the parties. United States v. Lanham, 416 F.2d 1140, 1143 (5th Cir. 1969).

The record is clear that the District Court in this case did not merely act as a disinterested moderator or umpire. His aggressive, relentless questioning of appellant's witnesses, his rehabilitation and validation of appellees' witnesses and his pervasive critical commentary about appellant's evidence and counsel sent an unmistakable message to the jury about his personal disdain for appellant's case and his opinion about the ultimate issues to be decided by the jury. Substantially all of the District Court's constant interruptions during trial aided appellees' defense and undermined appellant's theories of liability.

The District Court first made its hostility to appellant's liability evidence clear during the Rule 104(a) Daubert hearing for appellant's camping resort liability expert, Homer A. Staves. Ruling to allow Mr. Staves to testify about water safety precautions that should have been employed at appellees' camping resort, the District Court issued the following threat, twice:

"THE COURT: There's a stinger. I'm going to let the jury decide the case. If the jury decides in favor of the plaintiff, the plaintiff runs a big risk that I'm

8

going to just pull the verdict, I'm going to set it aside.  I have to tell you, you have vast experience, but this report is a travesty...."

(31a); (R. at page 382, lines 14-24, May 5, 2015.)

"THE COURT:  You're flabbergasted. I'm trying to keep this case from turning into a nightmare and I'm going to let the jury decide it, but quite candidly, I think there's going to be a big chance if they come out for the plaintiff, I'm going to set it aside, based on his testimony.  Because his testimony is just a travesty and there's no other way I can describe it."

(32a and 33a); (R. at page 383, lines 21-25 and at page 384, lines 1-2, May 5, 2015.)

Why would the District Court allow expert testimony it characterized as a "travesty" and then comment twice on the record that there was a "big chance" that a verdict based on such testimony favorable to appellant would likely be set aside by the Court?

The District Court may have ruled in favor of appellant at the Rule 104(a) hearing by allowing her to present the testimony of her liability expert, Homer A. Staves, but it then proceeded to dominate the questioning of the expert witness during direct examination by appellant's counsel in the presence of the jury.  For example, the District Court intervened to challenge Mr. Staves' testimony about best practices for roving security patrols at camping resorts like Pine Haven.

"THE WITNESS: And the best practices are, every campground, with or without water, somebody walks the campground or rides it in a golf cart or whatever, from the time they close the office, like normally it's 10 o'clock for most campgrounds. This one is earlier.

MR. VESPER: Seven o'clock.

THE WITNESS: And they - - they are a visible presence on the campground until everybody goes to bed.

THE COURT: But that's not necessarily just around the water. That's - -

THE WITNESS: No, it's not. It's the entire campground.

THE COURT: That's somebody around the entire campground.

THE WITNESS: That's right, that's what I said. It's the entire campground including water.

THE COURT: I mean, it could be a hundred acres or 200 acres.

THE WITNESS: That's right. Or 2,000 in my case.

THE COURT: Oh, that's right.

THE WITNESS: And we have people that are driving all night.

THE COURT: Now, 2,000 acres is many square miles."

(35a and 36a); (R. Homer A. Staves at page 456, lines 17-25, and at page 457, lines 1-14, May 6, 2015.)

On the issue of roving security patrols at camping resorts, the District Court was incredulous that appellant's liability expert would opine that they constitute best practices and ridiculed the notion that they represented an effective water safety measure.

On the issue of parental supervision of children at camping resorts, when Mr. Staves testified that camping resort management must operate based on the assumption that parents cannot possibly supervise their children every hour of the day in every location of the resort, the District Court intervened again in a hostile exchange with the witness to reinforce one of appellees' key defenses, shifting blame for the drowning of the minor decedent from camping resort management to the host parents, Timothy and Heather Miller:

"MR. VESPER:  Mr. Staves, in the majority of campgrounds that you've been to, does management take the position that the parents have to be with the child at - - you know, every minute of the day?

THE WITNESS: No.

MR. VESPER:  All right.  And - -

THE COURT:  The children have to be supervised - - where there's no lifeguard, doesn't it require adult supervision to go into a body of water, even in the middle of the day?

THE WITNESS:  Now if I remember right, yesterday, you said supervision does not require physical presence.

THE COURT:  Don't - - don't ask what I said.

THE WITNESS:  Well, that's what you said.

THE COURT:  No, you answer the question.

THE WITNESS:  I didn't hear the - -

THE COURT:  Am I the source of your expertise?

THE WITNESS:  No, I'm saying supervision is different from - -

THE COURT:  Answer the question.

THE WITNESS:  Supervision is different from being - -

THE COURT:  Answer the question.

MR. VESPER:  He's trying to, Your Honor.

THE COURT:  No, He's trying to tell me what I've said or what I say - -

THE WITNESS:  Okay, rephrase the question, would you, please.

THE COURT:  Where there's no lifeguard - -

THE WITNESS:  Right.

THE COURT:  - - can children go into a body of water at a campground without supervision, without adult supervision?

THE WITNESS:  They can, but they're not supposed to.

THE COURT:  Let's assume it's 1 o'clock in the afternoon and they were going to go either into the lake or to a swimming pool.  There is no lifeguard.

THE WITNESS:  And there's a sign that says they should be accompanied by an adult.

THE COURT:  So the answer is, they need to have adult supervision to go in, even in the middle of the day.

THE WITNESS:  If they want to obey the law, they do.

THE COURT:  Okay."

(85a and 86a); (R. Homer A. Staves at page 460, lines 4-25 and at page 461, lines 1-20, May 6, 2015.)

The District Court unambiguously telegraphed its hostility to appellant's evidence and its opinions regarding the ultimate issues of fact throughout the trial, thereby demonstrating partiality on behalf of appellees and influencing the jury to appellant's detriment.   Often, the District Court's incessant interventions constituted testimony, not inquiry, that buttressed appellees' defenses.

For example, one of the appellees' key defenses to appellant's allegations of camping resort negligence was the argument that proper supervision of the minor decedent, John J. Toribio, and his companion, Anthony Diocson, by the host parents, Timothy and Heather Miller, was not only required under camping resort

13

rules, but also mitigated the resort's own obligation to monitor young campers like the minor decedent in the swimming lake area.

During cross-examination of defense water safety expert, Maria Bella, Ph.D., appellant's counsel elicited the admission that it would not be reasonable for any camping resort manager to assume that parents are able to directly supervise children at all times, under all circumstances.

(82a and 83a); (R. Maria Bella, Ph.D. at page 1162, line 25 and at page 1163, lines 1-13, May 12, 2015.)

In an obvious effort to negate this major concession by the defense's water safety expert, the District Court interrupted the cross-examination to question the witness:

"THE COURT:  Can I ask you - -

THE WITNESS:  Yes, sir.

THE COURT:  Did the Millers warn the decedent and his friend, Anthony, not to go into the water when there was no parent - - when there was no adult present?

THE WITNESS:  Yes, sir, the boys were instructed not to go swimming.

THE COURT:  Do you know, was it just once or multiple times?

THE WITNESS: I don't know, but I do know that that instruction was given specifically right before Mr. Miller left, just a few minutes before the boys went into the lake.

MR. VESPER: Any other questions, Your Honor?

THE COURT: No."

(83a and 84a); (R. Maria Bella, Ph.D. at page 1163, lines 14–25 and at page 1164, lines 1-2, May 12, 2015.)

The District Court's interruption of appellant's cross-examination of the defense water safety expert at that precise moment was not designed to clarify the evidence, control the orderly presentation of evidence, limit counsel to the parameters of standing evidentiary rulings or prevent the repetition of testimony. The only plausible interpretation of the District Court's motivation for intervening at that particular point in the trial was to nullify the effect of the defense expert's concession on parental supervision and remind the jury of the minor decedent's comparative negligence.

Appellees also maintained throughout the trial that they had complied with the minimum requirements of the New Jersey State Sanitary Code, N.J.A.C. 8:26, by conspicuously posting warning signs prohibiting entry into the swimming lake after management had left the premises.

In another exchange between appellant's counsel and the defense water safety expert, Maria Bella, Ph.D., on cross-examination, the expert conceded that the least effective means of risk removal or reduction at water facilities was placement of warning signs. She conceded that if a camping resort posts a warning sign near a water facility, but the risk of serious injury or death remains, and there are additional, feasible, reasonable measures that could be employed to further reduce the risk, such measures should be adopted by camping resort management. (80a); (R. Maria Bella, Ph.D. at page 1153, lines 3-21, May 12, 2015.)

Dissatisfied with the pro-appellant direction of such testimony, the District Court shockingly intervened again, not to question the witness for clarification purposes, or to control the orderly presentation of evidence, but to testify on an ultimate issue of fact as follows:

"THE COURT:  In a water facility, *you can never remove the risk of drowning*.

THE WITNESS:  Not entirely, no, sir.

THE COURT:  *Yeah, it's impossible.*

THE WITNESS: Correct.

THE COURT:  *Somebody goes in the water, who knows, has a cramp, has a heart attack, you can't eliminate the risk of drowning, can you?*

THE WITNESS:  No, sir, not completely, although we will do our level

best."

(80a and 81a); (R. Maria Bella, Ph.D. at page 1153, lines 23-25 and at page 1154,

lines 1-7, May 12, 2015.)

By intervening during the cross-examination of the defense water liability

expert in these two instances, the District Court did not clarify the evidence, did

not control the orderly presentation of evidence, did not confine counsel to the

parameters of standing evidentiary rulings or prevent undue repetition of

testimony.   Rather, the District Court intervened twice just when appellant's

counsel had secured meaningful concessions from the defense water liability

expert, with the effect of negating such concessions and buttressing key defense

arguments at a moment in the trial most opportune for appellees.  By reminding the

jury at that precise moment during cross-examination of the defense water liability

expert that the host parents had warned the minor decedent and his companion on

multiple occasions to stay out of the water when adults were not present, the

District Court was not making a point of clarification or managing the orderly flow

of testimony, but placing its judicial stamp of approval on a key defense argument

about the minor decedent's comparative negligence.  By making the statement, and

not an inquiry, that no camping resort or similar enterprise can ever entirely

remove the risk of drowning, the District Court was not simply controlling the

orderly presentation of evidence or preventing repetition of testimony, but placing its powerful judicial imprimatur on a key defense argument and conveying its opinion about an ultimate issue of fact.    It would be inconceivable for a jury of laypersons to ignore or retreat from the District Court's unambiguous assessment of the evidence and demonstrated partiality in favor of appellees.  Indeed with its verdict, allocating seven percent (7%) liability to the defendant camping resort and ninety-three percent (93%) liability to the minor decedent, the jury clearly adopted and incorporated the District Court's positions regarding the minor decedent's comparative negligence and the "futility" of adopting camping resort policies and procedures to reduce the incidence of drowning deaths.

The District Court seized almost every opportunity to buttress appellees' defenses on the minor decedent's comparative negligence and the obligation of parents, like the host parents, Timothy and Heather Miller, to supervise their children at a camping resort.    During his examination of the camping resort's manager, Terry Jordan, appellant's counsel asked about a "dummy" surveillance camera at Pine Haven which was located near the swimming pool at the resort, not the swimming lake where the minor decedent drowned.  Jordan conceded that the inoperable "dummy" camera in the swimming pool area was intended to deter people from "sneaking into the pool."    No such camera was placed near the swimming lake where the drowning occurred to deter entry into that body of water.

The District Court intervened again to remind the jury about appellees' comparative negligence defense, suggesting that such a deterrence measure would only be necessary to deter people who should not be near the body of water in the first place:

"MR. VESPER:  All right.  Let's agree then that the reason that somebody put in a surveillance camera that doesn't work was to deter what? It was the deterrence for what?

THE WITNESS:  I would guess for people sneaking into the pool.

MR. VESPER:  Right.

THE COURT:  *I mean, at a time they shouldn't be in the pool.*

THE WITNESS:  Exactly.

MR. VESPER:  Yeah.  Thank you, Your Honor, for that clarification."

(25a); (R. Terry Jordan at page 249, lines 14-22, May 5, 2015.)

Appellant acknowledges that a trial judge "cannot be forced to occupy a passive position as a moderator between the disputants." Patterson v. United States, 413 F.2d 1001, 1003. (5th Cir. 1969).  However, with his participation in a trial, the judge may not offer his views upon ultimate issues of fact.  Travelers Insurance Company v. Ryan, 416 F.2d 362, 364 (5th Cir. 1969).  He may not take over the argument of one of the parties. United States v. Lanham, 416 F.2d 1140, 1143 (5th Cir. 1969).

In the underlying matter, the District Court repeatedly rebuked the entreaties of appellant's counsel about its ongoing, unceasing commentary and editorializing about appellant's evidence and ultimate issues of fact throughout the trial.

When one of the host parents, Timothy Miller, a seasonal camper at appellees' camping resort, testified that he had personally witnessed young children entering the swimming lake without parents or adults supervising them on prior occasions, his testimony supported appellant's argument that camping resort management should have also been aware that children cannot be supervised at swimming facilities at every moment, in every location. Appellant's position was that the camping resort had a duty to provide additional safety measures (roving security patrols, properly positioned surveillance cameras, better lighting at dusk and evenings) given the reality that parents cannot supervise their children at all hours and in all locations. Dissatisfied with Mr. Miller's testimony that he had observed unsupervised children in the lake on prior occasions, the District Court could not resist intervening to weaken testimony favorable to appellant:

"MR. HERMESMANN: I believe you indicated earlier that you've seen - - seen children going into the lake unsupervised, is that correct?

THE WITNESS: There's - - on several occasions, I've witnessed that happening.

THE COURT:  You witnessed children going into the lake without their parents being in the lake?

THE WITNESS:  Correct.

THE COURT:  They could have been on the shore, though.

THE WITNESS:  Correct.

THE COURT:  So when you say they were unsupervised, you mean the parents weren't in the water with them.

THE WITNESS:  Correct.

THE COURT:  Okay."

(39a and 40a); (R. Timothy Miller at page 676, line 25 and at page 677, lines 1-13, May 6, 2015.)

Here, the District Court was not satisfied with testimony that supported appellant's argument that other safety measures were necessary given the impossibility of constant adult supervision of children. The District Court interrupted Mr. Miller's testimony to suggest to the jury the possibility that on those occasions when Mr. Miller saw unsupervised children in the swimming lake, their parents may have been in close proximity on the nearby shore. The District Court's interruption and intervention at this moment in the trial could not possibly be interpreted as promoting a fair and expeditious presentation of the evidence. Again, in this instance, the only reasonable interpretation of the District Court's

behavior was to undermine evidence that supported appellant's supervision argument, not only disrupting the presentation of such evidence, but conveying the Court's own opinion of such evidence in a way that could only be prejudicial to appellant on an ultimate issue of fact.

"A trial court must be ever mindful of the sensitive role it plays in a jury trial and avoid even the appearance of advocacy or partiality." United States v. Malcolm, 475 F.2d 420 (9th Cir. 1973). The record in this case is replete with instance after instance in which the District Court disrupted the presentation of appellant's evidence and conveyed to the jury its unmistakable opinion about the ultimate issues to be decided by the jury.

One of appellees' principal defenses was that they had complied with the dictates of the New Jersey State Sanitary Code, N.J.A.C. 8:26, by posting conspicuous signage near the swimming lake, warning and prohibiting campers from entering the swimming lake after management had left the premises. Appellant argued throughout the trial that compliance with the minimal signage requirements of the New Jersey Sanitary Code did not satisfy the applicable duty of care which camping resort management owed its campsite renters and guests. Appellant also presented evidence that prior to the decedent's drowning, appellees had failed to comply with the signage requirements and that new signs were

erected after the fatality had occurred. At every opportunity, the District Court attempted to undermine appellant's arguments about signage.

Heather Miller, one of the host parents, testified that prior to the decedent's drowning, the only sign anywhere near the swimming lake was "a sign that was dilapidated and covered with brush and couldn't make out what was on the sign…."

(76a); (R. Heather Miller at page 988, lines 22-23, May 11, 2015.)

When Ms. Miller acknowledged that additional signs were added to the lake area after the drowning, "along the road, near the lake, along the tree area," the District Court jumped in to blunt the impact of such testimony with unrelated questions about lifeguards:

"THE COURT: Ms. Miller, you knew from the very start before you went, that there were no lifeguards anywhere."

THE WITNESS: Yes. I knew there were none there.

MR. CICCOTTA: Your Honor, I didn't ask that question.

THE COURT: I'm asking it. You knew there were no lifeguards. You knew that from the start.

THE WITNESS: Yes.

THE COURT: Okay. So it was no - - no secret. I mean, that you said  - - like you thought there were lifeguards and found out that there weren't. You knew there were no lifeguards anywhere at that resort.

THE WITNESS: That's correct.

THE COURT: Okay.

MR. CICCOTTA: And we've never - -

THE WITNESS: And I answered that.

MR. CICCOTTA: We've never suggested otherwise."

(77a and 78a); (R. Heather Miller at page 991, lines 17-25, and page 992, lines 1-8, May 11, 2015.)

To promote further doubt in the minds of the jurors about Ms. Miller's testimony regarding signage at the lake, the District Court again interrupted to aid the appellees' position:

"THE COURT: But back in 2010, were you looking when you went there, were you looking for signs? When you were deciding whether this was the place for you, were you searching for signs?

THE WITNESS: No.

(87a); (R. Heather Miller at page 996, lines 16-20, May 11, 2015.)

On the signage issue, the District Court also intervened to cast doubt on the observations of the minor decedent's sister, Odalie Toribio, who testified that she

saw no signs at the swimming lake on the night of her brother's drowning death, and no signs at the swimming lake nine days later when she and her family returned to the camping resort for a memorial service at the swimming lake.

(42a and 43a); (R. Odalie Toribio at page 753, lines 7-25 and at page 754, lines 1-5, May 7, 2015.)

The District Court mocked this line of inquiry, casting doubt on the testimony of the decedent's sister that she was looking for signs during the memorial service with its own leading questions:

"MR. CICCOTTA:   Odalie, how many times were you actually at Pine Haven?

THE WITNESS:  Twice.

MR. CICCOTTA: All right.  So you were there the evening that John passed away.  Were you there any other times?

THE WITNESS:  Yes.

MR. CICCOTTA:  When?

THE WITNESS:  Nine days after he passed away.

MR. CICCOTTA: Nine days after - -

MR. HERMESMANN:  Same objection.

MR. CICCOTTA:  Again, signs, Your Honor.

THE COURT:  Not nine days after, I'm not going to let you ask.

*Were you looking for signs when you were there?*

THE WITNESS: No, we were there to do a memorial service.

THE COURT: *Right.   You weren't - - you weren't paying attention to whether there were signs anywhere, were you?*

THE WITNESS: I actually was.  I wanted to see if there were signs.

THE COURT: *What, somebody told you about signs?*

THE WITNESS: No, I just wanted to see - -

THE COURT: *You just thought of it on your own.  You just decided you wanted to see if there were signs?*

THE WITNESS: Yes."

(42a and 43a); (R. Odalie Toribio at page 753, lines 7-25 and at page 754, lines 1-5, May 7, 2015.)

Here, the District Court ridiculed the notion that the minor decedent's grieving sister was herself interested in the existence of warning signs at the swimming lake, actually suggesting that "somebody else" told her about the sign issue.  The jury certainly was free to conclude that the District Court was suggesting that counsel had "prepped" the witness for such testimony.

The District Court further demonstrated its partiality by impugning the motives of appellant's counsel in the presence of the jury.  For example, appellant's counsel asked the host mother, Heather Miller, about her observations

at the swimming lake during her search for the minor decedent and the presence of a significant "drop-off" in the water near the shoreline. Without an objection by appellees' counsel, the District Court interrupted the direct examination to suggest an improper motive for appellant's counsel's questions.

"THE COURT: What does this have to do with the case? Maybe you're trying to engender some kind of sympathy that has nothing to do with the merits of the case."

(37a); (R. Heather Miller at page 598, lines 20-22, May 6, 2015.)

When appellant's counsel simply asked Ms. Miller whether she saw anyone from camp management near the swimming lake during her search for the minor decedent, appellees' counsel objected and the District Court again assigned an improper motive for appellant's counsel's questions:

"Q. All right. Did you see anyone from camp management - -

MR. HERMESMANN: Objection, your Honor. Again, what does this have to do with the liability as to what happened after the drowning?

THE COURT: Maybe engender some sympathy that's irrelevant, I don't know.

MR. HERMESMANN: Right. That's the point."

(38a); (R. Heather Miller at page 601, lines 2-8, May 11, 2015.)

The District Court did not limit its advocacy on behalf of appellees by only undermining the liability evidence presented by appellants, but also intervened to support appellees' defenses to appellant's damages evidence.

Appellant presented the testimony of forensic economist, Frank Tinari, Ph.D. Dr. Tinari testified about the financial support and the value of companionship, advice, services, guidance and counseling services, which the minor decedent would have provided his mother, the appellant, had he not drowned at appellees' camping resort on August 8, 2010. While Dr. Tinari testified, he made reference to various charts, one of which needed to be modified out of the jury's presence in order to comply with a prior evidentiary ruling. As he attempted to explain his calculation on the modified chart in the jury's presence, the District Court interrupted again, without a defense objection, to editorialize about the expert's presentation:

"THE COURT: Well, but you want to - - *I'm telling you right now, Mr. Tinari, this is a confusing chart.*

BY MR. VESPER:

Q. And you heard that - -

THE COURT: *It's mind-blowingly confusing.*"

(44a); (R. Frank Tinari, Ph.D. at page 807, lines 2-6, May 7, 2015.)

Then, as appellees' counsel sat back, the District Court engaged in an extended cross-examination of Dr. Tinari, asking that he justify each calculation and challenging the expert's assumptions, which were based upon the expert's personal knowledge of and interviews with appellant's family.

(44a – 72a); (R. Frank Tinari, Ph.D. at pages 807-835, May 7, 2015.)

While the District Court actively and aggressively challenged appellant's fact and expert witnesses throughout the trial, it offered comments to rehabilitate and validate appellees' witnesses. During the examination of camping resort manager, Terry Jordan, by appellant's counsel, the District Court limited cross-examination by leading questions. In the presence of the jury, the District Court characterized appellees' witness as being forthright and cooperative on the witness stand:

"MR. VESPER: I'm asking, if Your Honor please, for the right to cross-examine a witness.

THE COURT: No, he has  - - you don't have an absolute right to cross-examine him.

MR. VESPER: I have a - -

THE COURT: No, you do not. The rules leave control of me. He has not been - -

MR. VESPER: You have control, you certainly - -

THE COURT: He has not been evasive. He's tried to answer every question.

(23a and 24a); (R. Terry Jordan at page 240, lines 22-25 and page 241, lines 1-6, May 5, 2015.)

Again, appellant acknowledges the responsibility of federal trial judges to assist with the conduct of jury trials through participation in the examination of witnesses and balanced commentary about the evidence for clarification purposes. United States v. Cole, 491 F.2d 1276, 1278 (4th Cir. 1974); United States v. Cassiagnol, 420 F.2d 868, 879 (4th Cir. 1970); Pollard v. Fennell, 400 F.2d, 421, 423 (4th Cir. 1968). However, the District Court in this case far exceeded the bounds of its proper judicial role with a relentless domination of the examination of witnesses throughout the trial, effectively pre-empting counsel's legitimate function in the adversarial process. Moreover, through its constant interruptions to question witnesses or editorialize about the quality of appellant's evidence and arguments, the District Court was more disruptive to the orderly presentation of evidence than clarifying. Most significantly, as this Appellate Court considers the record in total context to determine whether the District Court's conduct so tainted the verdict that it must be set aside, it must consider the fact that the District Court's constant interventions at trial were not balanced between the parties and conveyed the unambiguous impression to the jury of the court's partiality for

appellees' position over appellant's position and its opinions about ultimate issues

of fact.  United States v. Head, 697 F.2d 1200 (4th Cir. 1982).  Such pervasive

judicial obstruction and commentary cannot be considered harmless error, as it

influenced the jury adversely to appellant, thereby denying her a fair trial.

## POINT II: FAILURE TO CHARGE THE JURY
## ON DUTY VOLUNTARILY ASSUMED

The District Court also committed reversible error by refusing to charge the

jury with appellant's proposed instruction based on New Jersey Model Civil Jury

Charge 510.C.  Appellant's proposed Points for Charge included the following:

### MCJC  5.10C  Undertaking by Defendant Camping Resort
### of Surveillance, Camera, Lights & Motion Sensor Lights
### Voluntarily Assumed
(Approved Before 1984)

(1)  One who in the absence of a legal obligation to do so voluntarily
undertakes to render a service for the protection of the safety of another may
become liable to him/her for the failure to perform, or the failure to exercise
reasonable care in the performance of that service.  His/Her responsibility,
however, is only commensurate with the extent of his/her voluntary undertaking
and his/her liability does not arise unless it appears from the evidence that his/her
negligence had a proximate causal relationship to the occurrence of the mishap,
which brought about the injuries.

**Cases**:

Gudnestad v. Seaboard Coal Dock Co., 27 N.J. Super. 227 (App. Div. 1953);
Wolcott v. N.Y. and L.B.R.R. Co., 68 N.J.L. 421 (Sup. Ct. 1902).

**THE FOLLOWING MAY BE ALTERNATIVELY CHARGED WHERE
APPLICABLE:**

(2)   Where a defendant has gratuitously undertaken to do an act or to perform a service recognizably necessary to another's bodily safety and there is reasonable reliance thereon, the defendant will be liable for the harm sustained by the other party resulting from defendant's failure to exercise reasonable care to carry out the undertaking.

**Cases**:

Johnson v. Souza, 71 *N.J. Super*. 240 (App. Div. 1961); *Restatement of Torts, Sec*. 325, p. 831 (1934): *Miller v. Muscarelle*, 67 *N.J. Super*. 305 (App. Div. 1961).

Appellant requested that the District Court instruct the jury with this "good samaritan" charge in order to assist it in understanding the concept of "duty." The proposed charge is based upon the Restatement of Torts (Second) §§ 323 and 324A.  It posits that a person or entity may assume an obligation to exercise reasonable care in the performance of a service even if they do not have an independent obligation to do so.  If that person or entity voluntarily undertakes to provide a service for the protection or safety of another, reliance by the protected party is deemed reasonable and foreseeable.  Moreover, where a person or entity voluntarily undertakes to provide such service and can prevent serious, foreseeable harm by exercising reasonable care in providing such service, that person or entity is liable for harm caused by the failure to act reasonably under the circumstances.

Evans v. Liberty Mutual Insurance Co., 398 F2d 665, 666-67 (3rd Cir. 1968).

This concept of a "duty voluntarily assumed" has been recognized by federal courts and New Jersey state courts.  New Jersey state courts have imposed this duty of reasonable care on defendants who voluntarily undertake services, where

there is reasonable reliance thereon by others and where such reliance is foreseeable to the defendant. Johnson v. Souza, 71 N.J. Super. 240, 176 A.2d 797, 798-99 (N.J. Super. Ct. App. Div. 1961); see also, Restatement (Second) of Tort § 323; New Jersey Model Civil Charge 5.10C.

In New Jersey, this concept of a "duty voluntarily assumed" has been applied in various contexts. New Jersey courts have held that a driver who voluntarily "waves" another driver into traffic assumes a duty to exercise reasonable care even though drivers do not have an independent duty to check traffic for other drivers on the roads. Thorne v. Miller, 317 N.J. Super. 554, 722 A.2d 626, 629 (N.J. Super. Ct. L. Div. 1998). The United States District Court for the District of New Jersey has held that a defendant who voluntarily agrees to hold a ladder for another has a duty to exercise reasonable care in properly anchoring the ladder to prevent injury even though he or she would not have an independent duty to do so under different circumstances. Ceneviva v. Homes, 2011 U.S. Dist. LEXIS 65061; 2011 WL 2470596.

In this case, appellant argued at trial that appellees held themselves out as offering a safe and secure family camping resort. At trial, appellees painted a picture for the jury of an unmanaged, unsupervised RV park where campers were essentially responsible for their own safety and the safety of their children. In reality, Pine Haven Camping Resort management provided roving security patrols

at certain times, surveillance cameras in select locations and artificial lighting in select locations.    To the extent that appellees used roving security patrols, surveillance cameras and artificial lighting in select locations on some days and in some areas of the camping resort, appellant maintained that they had an obligation to do so reasonably, particularly in hazardous areas such as the swimming lake. Appellant implored the District Court to charge the jury with the "duty voluntarily assumed" instruction, as the evidence conclusively established that appellees had undertaken to provide security measures at their camping resort upon which reasonable campers and their guests would foreseeably rely.

For example, during the busy summer months in 2010, appellees provided regular roving security patrols near the swimming lake on Friday and Saturday evenings and all holiday weekend nights, but not on regular Sunday evenings such as the evening that the minor decedent entered the swimming lake and drowned. (20a, 21a, and 22a); (R. Terry Jordan at page 215, lines 5-25, page 216, lines 1-25 and page 217, lines 1-9, May 5, 2015.)  Also, while appellees used surveillance cameras in select areas of the resort such as the snack area and the arcade/gameroom, they failed to provide surveillance cameras anywhere near the swimming lake. (26a, 27a, 28a, and 29a); (R. Terry Jordan at page 251, lines 13-25, page 252, lines 1-25, page 253, lines 1-25 and page 254, lines 1-2, May 5, 2015.) Also, artificial lighting, including motion-sensitive lighting and light-

sensitive lighting, was employed through the camping resort, but not near the swimming lake.  (30a); (R. Terry Jordan at page 319, lines 16-20, May 5, 2015.)

Under the facts of this case, the District Court committed reversible error by refusing to so charge the jury with the "duty voluntarily assumed" instruction.

## **CONCLUSION**

Given the cumulative effect of the District Court's constant, excessive, obstructive participation in the examination of witnesses on appellees' behalf, and its prejudicial running commentary on dispositive issues to the detriment of appellant, and given the District Court's refusal to properly charge the jury regarding duty, appellant respectfully requests that the Order of the District Court affirming the jury's verdict be vacated and that this case be remanded to the District Court for a new trial on all issues.

Respectfully submitted,

BY:  /Reno J. Ciccotta
    RENO JOHN CICCOTTA, ESQUIRE
    MANIACI, CICCOTTA & SCHWEIZER, LLP
    385 Kings Highway North, Suite 105
    Cherry Hill, NJ 08034
    Phone:  856-321-9331

    Attorney for Appellant, Betania A. Toribio,
    Administratrix of the Estate of
    John Joaquin Toribio, deceased, and
    Betania A. Toribio, Individually

## **CERTIFICATE OF BAR MEMBERSHIP**

RENO JOHN CICCOTTA, ESQUIRE certifies as follows:

1. I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

/Reno J. Ciccotta
RENO JOHN CICCOTTA, ESQUIRE

Dated:  March 15, 2016

# AFFIDAVIT OF SERVICE

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT



## 15-2355

BETANIA TORIBIO

*Appellant*

v.

PINE HAVEN, LLC, et al

*Appellee*

COUNTY OF PHILADELPHIA

I, Frederick W. Wright, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

I am retained by Reno J. Ciccotta, Esq., Attorney for Appellant, that on this 15th day of March 2016, I deposited two copies of the Brief and Appendix for Appellant, with the United States Post Office priority mail to the following and in addition served by ECF.

Patrick J. Hermesmann, Esq.
Terkowitz & Hermesmann
309 Fellowship Rd.
Suite 200
Mount Laurel, NJ 08022

John C. Simmons, Esq.
Hoagland Longo Moran Dunst & Doukas
40 Paterson St.
P.O. Box 480, Room 301
New Brunswick, NJ 08903

Dennis M. Marconi, Esq.
Barnaba & Marconi
315 Lowell Ave.
Trenton, NJ 08619

Filing to the Court has been perfected on the same date as above.

/s/Frederick W. Wright
FREDERICK W. WRIGHT
Wright Appellate Services
517 Jefferson Building
1015 Chestnut Street
Philadelphia, PA  19107
(215) 733-9870*(800) 507-9020*FAX (215) 733-9872
Email address: appealfww@aol.com

## VIRUS CHECK COMPLIANCE

This document has been scanned for viruses and is reported by Symantec Antivirus Corporate edition ® to be virus free as of the date it was scanned. All reasonable measures have been taken to protect all of *Wright Appellate Services, LLC* documents, but we cannot guarantee against viruses that have yet to be discovered. The PDF file is identical to the hard copy.


*Frederick W. Wright*
Frederick W. Wright
*Wright Appellate Services, LLC*
1015 Chestnut Street, Suite 517
Philadelphia, PA 19107
(215) 733-9870
Email address: appealfw@wrightappellateservices.com

i

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Notice of Appeal, filed May 28, 2015 ........................ | 1a |
| Judgment in a Civil Case, dated May 14, 2015 ......... | 3a |
| U.S. District Court Docket Entries ............................ | 4a |
| *Excerpts* Transcript, dated May 5, 2015 ................ | 19a |
| *Excerpts* Transcript, dated May 7, 2015 ................ | 34a |
| *Excerpts* Transcript, dated May 11, 2015 .............. | 41a |
| *Excerpts* Transcript, dated May 12, 2015 .............. | 75a |

Case 1:12-cv-04975-JEI-JS   Document 141-1   Filed 05/28/15   Page 2 of 4 PageID: 1343

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BETANIA A. TORIBIO, ADMINISTRATRIX OF THE ESTATE OF JOHN JOAQUIN TORIBIO, DECEASED, and BETANIA A. TORIBIO, INDIVIDUALLY | : CIVIL ACTION NO.<br>: 1:12cv-04975-JEI-JS<br>: |
| vs. | : |
| PINE HAVEN, LLC, doing business as PINE HAVEN CAMPGROUND and PINE HAVEN CAMPING RESORT and DIVERSIFIED INVESTMENTS, INC., a/k/a DIVERSIFIED INVESTMENTS, LLC, a/k/a DIVERSIFIED INVESTMENT SERVICES, LLC | : HONORABLE JOSEPH E. IRENAS<br>:<br>:<br>: NOTICE OF APPEAL TO THE<br>: U.S. COURT OF APPEALS<br>: FOR THE THIRD CIRCUIT<br>: |
| vs. | : |
| HEATHER MILLER, a/k/a HEATHER DIOSCON, TIMOTHY MILLER, ANTHONY DIOSCON, MICHELLE WHEELER and JOHN DOES 1-10 | : |

Notice is hereby given that plaintiff, Betania A. Toribio, Administratrix of the Estate of John Joaquin Toribio, Deceased, and Betania A. Toribio, Individually, appeals to the United States Court of Appeals for the Third Circuit from the final judgment of the United States District Court, District of New Jersey, entered in this action on May 14, 2015.

WESTMORELAND, VESPER & QUATTRONE, P.A.

BY: *Thomas J. Vesper*
THOMAS J. VESPER, ESQUIRE
Attorney for Plaintiff, Betania A. Toribio,
Administratrix of the Estate of
John Joaquin Toribio, deceased, and
Betania A. Toribio, Individually

MANIACI, CICCOTTA & SCHWEIZER, LLP

BY: 
RENO JOHN CICCOTTA, ESQUIRE
Attorney for Plaintiff, Betania A. Toribio,
Administratrix of the Estate of
John Joaquin Toribio, deceased, and
Betania A. Toribio, Individually

-1a-

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BETANIA A. TORIBIO, ADMINISTRATRIX OF THE ESTATE OF JOHN JOAQUIN TORIBIO, DECEASED, and BETANIA A. TORIBIO, INDIVIDUALLY | CIVIL ACTION NO. **1:12cv-04975-JEI-JS** |
| vs. | **HONORABLE JOSEPH E. IRENAS** |
| PINE HAVEN, LLC, doing business as PINE HAVEN CAMPGROUND and PINE HAVEN CAMPING RESORT and DIVERSIFIED INVESTMENTS, INC., a/k/a DIVERSIFIED INVESTMENTS, LLC, a/k/a DIVERSIFIED INVESTMENT SERVICES, LLC | |
| vs. | |
| HEATHER MILLER, a/k/a HEATHER DIOSCON, TIMOTHY MILLER, ANTHONY DIOSCON, MICHELLE WHEELER and JOHN DOES 1-10 | **CERTIFICATE OF SERVICE** |

The undersigned certifies that the foregoing Notice of Appeal to the U.S. Court of Appeals for the Third Circuit has been filed and served upon defense counsel, Patrick J. Hermesmann, Esquire, via the court's electronic filing system on May 28, 2015.

WESTMORELAND, VESPER & QUATTRONE, P.A.

BY: *Thomas J. Vesper*
THOMAS J. VESPER, ESQUIRE
Attorney for Plaintiff, Betania A. Toribio,
Administratrix of the Estate of
John Joaquin Toribio, deceased, and
Betania A. Toribio, Individually

MANIACI, CICCOTTA & SCHWEIZER, LLP

BY:
RENO JOHN CICCOTTA, ESQUIRE
Attorney for Plaintiff, Betania A. Toribio,
Administratrix of the Estate of
John Joaquin Toribio, deceased, and
Betania A. Toribio, Individually

-2-

-2a-

AO450 (Rev. 5/85) Judgment in a Civil Case

# UNITED STATES DISTRICT COURT

FOR THE _____    DISTRICT OF _____    NEW JERSEY _____

BETANIA TORIBIO,

**Plaintiff**

v.

PINE HAVEN LLC, et al.,

**Defendants.**

## JUDGMENT IN A CIVIL CASE

Case Number:    12-4975 (JEI)(JS)

X  **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☐  **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that judgment of no cause of action is entered in favor of Defendants Pine Haven LLC and Diversified Investments, Inc., and against Plaintiff Betania Toribio.

May 14, 2015
_____
Date

HONORABLE JOSEPH E. IRENAS
SENIOR UNITED STATES DISTRICT JUDGE

-3a-