No. 15-2355

# In the United States Court of Appeals
## for the Third Circuit

———————————

BETANIA TORIBIO, Administratrix of the Estate of
John Joaquin Toribio, Deceased and Individually,
*Plaintiff-Appellant*
v.
PINE HAVEN LLC, d/b/a Pine Haven Campground, and Pine Haven
Camping Resort; DIVERSIFIED INVESTMENTS INC,
a/k/a Diversified Investments, LLC,
a/k/a Diversified Investments Services, LLC,
*Defendants-Appellees*
v.
HEATHER MILLER, a/k/a Heather Dioscon; TIMOTHY MILLER;
ANTHONY DIOSCON; MICHELLE WHEELER,
*Third Party*

**On Appeal from the United States District Court
for the District of New Jersey**

———————————

**BRIEF OF APPELLEES**

———————————

PATRICK J. HERMESMANN
TERKOWITZ & HERMESMANN
Suite 200
309 Fellowship Road
Mount Laurel, NJ 08022
(856) 642-4012
phermesmann@hanover.com

*Counsel for Appellees*

## CORPORATE DISCLOSURE STATEMENT AND
## STATEMENT OF FINANCIAL INTEREST

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, PINE HAVEN LLC, d/b/a Pine Haven Campground, and Pine Haven Camping Resort; DIVERSIFIED INVESTMENTS INC, a/k/a Diversified Investments, LLC, a/k/a Diversified Investments Services, LLC makes the following disclosure:

1) For non-governmental corporate parties please list all parent corporations:

N/A

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

N/A

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/ Patrick J. Hermesmann                    Dated:  6/24/2016

i

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF THE FACTS .............................................................................. 1

SUMMARY OF THE ARGUMENT ....................................................................... 2

ARGUMENT ........................................................................................................... 3

    POINT I:   THE PURPORTED CONDUCT OF THE TRIAL JUDGE
    DID NOT UNDERMINE THE PLAINTIFF'S PRESENTATION OF
    HER CASE, NOR DID SUCH CONDUCT IMPACT THE JURY'S
    VERDICT ........................................................................................................... 3

    POINT II:  THE DISTRICT COURT CORRECTLY CHARGED
    THE JURY AS TO DUTY ............................................................................... 17

CONCLUSION ..................................................................................................... 20

COMBINED CERTIFICATIONS .......................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

Ceneviva v. Homes,
    No. 09-2452, 2011 U.S. Dist. LEXIS 65061 (D. N.J. June 20, 2011) .................17

Liteky v. United States,
    510 U.S. 540 (1994)...........................................................................................8, 9

Thorne v. Miller,
    317 N.J. Super. 554, 722 A.2d 626 (N.J. Super. Ct. Law Div. 1998)..................17

U.S. v. Malcolm,
    475 F.2d 420 (9th Cir. 1973) ................................................................................9

## STATEMENT OF THE FACTS

This lawsuit arises out of the drowning death of John Toribio on August 8, 2010, at approximately 8:15 P.M. at the Pine Haven Campground, Ocean View, New Jersey ("Pine Haven").   John Toribio was spending the weekend at Pine Haven with his best friend, Anthony Dioscon, and Anthony's parents.  The parents owned a camper that was kept at Pine Haven.  John Toribio was 14 years old at the time, and known to be a capable swimmer.  The appellant asserted throughout the trial that Pine Haven was negligent for myriad reasons:  (1) failing to place a fence around the lake; (2) insufficient artificial lighting; (3) failure to install surveillance cameras; and, (4) failure to have a   roving security throughout the entire campground.

In defense of the allegations, Pine Haven offered fact and expert testimony to demonstrate that the   entire campground, to include the lake, had passed inspection in July 2010 by the Cape May County Department of Health and that they were fully compliant with all applicable regulations, statutes, codes, and laws. Pine Haven further demonstrated that in addition to applicable codes, etc., the industry standard did not require fencing, lighting, surveillance cameras, or a roving patrol in the area of the lake.  While disputed by the plaintiff, Pine Haven also entered evidence to demonstrate that the lake had prominent signs warning all swimmers that a lifeguard was not on duty, and that those under the age of 16 must

1

be accompanied by an adult.  As to the lighting issue, uncontradicted testimony was offered by multiple witnesses that it was light out when the drowning occurred.  Finally, there was uncontradicted testimony that John Toribio was told on 20+ occasions by Heather Dioscon Miller (John's friend's mother) not to go into the lake.

Against this backdrop, the jury found both the plaintiff and the defendant negligent and apportioned fault at 93% as to the plaintiff and 7% as to the defendant.

## SUMMARY OF THE ARGUMENT

The appellant's assertion that the conduct of the trial judge influenced the jury's verdict is without merit.  The trial judge's minimal questioning of witnesses was consistent with his role and did not remotely approach the level of bias, prejudice, or advocacy. Rather, as permitted the trial judge on minimal occasions sought clarification from witnesses on minute portions of their testimony.  The assertion that the trial judge engaged in favoritism towards the defense is also incorrect, and fully undermined by various highly contested evidential rulings that were made in favor of the appellant.  Finally, the jury's verdict was fully consistent with the evidence presented to them.

**ARGUMENT**

**POINT I:   THE PURPORTED CONDUCT OF THE TRIAL JUDGE DID NOT UNDERMINE THE PLAINTIFF'S PRESENTATION OF HER CASE, NOR DID SUCH CONDUCT IMPACT THE JURY'S VERDICT**

The appellant's assertion that the trial judge undermined her case is not supported by the record.  Contrary to this assertion, the trial judge went out of his way to allow the plaintiff to fully present her case – often over the objection of the defense.  Nonetheless, the appellant asserts that the District Court "unambiguously telegraphed its hostility to appellant's evidence and its opinions regarding the ultimate issues of fact throughout the trial, thereby demonstrating partiality on behalf of appellees and influencing the jury to appellant's detriment."   (see Appellant's brief page 13).  The jury's verdict as to liability demonstrates that the appellant's arguments as to the negligence of Pine Haven were not undermined by the purported conduct of the trial judge.

The ultimate issue on liability, as presented to the jury, was whether John Toribio was negligent, and whether Pine Haven was negligent.  If both were found to be negligent, the jury was required to apportion negligence.  Having heard all of the evidence the jury found both parties to be negligent, and apportioned fault at 93% as to the plaintiff and 7% as to the defendant.  Accordingly, a no cause of action was entered against the plaintiff in that John Toribio was deemed to be more than 50% at fault.

3

The favorable plaintiff verdict as to the defendant's negligence completely undermines the assertion that the trial judge somehow acted in a hostile fashion to the detriment of the plaintiff.  Despite the alleged bias by the trial judge against the appellant's case, the jury agreed with the plaintiff's argument that Pine Haven was negligent.  The inquiry did not end with that finding in that a finding of negligence as to the defendant does not necessarily result in a plaintiff's verdict.  The plaintiff's negligence must also be considered, with apportionment to follow if both plaintiff and defendant are found to be negligent.  In the matter before the court, once the jury determined that both parties were negligent, they apportioned liability – resulting in a defense verdict.

The negligence of John Toribio was not disputed.  In fact, the appellant conceded during closing argument that John Toribio was negligent.  When addressing the negligence of the parties, the appellant's attorney suggested that the campground was 90% at fault, and that John Toribio was 10% at fault:

> So I respectfully suggest that it be 90 percent. And for a 14 year old on a hot summer day with a young girl in a bathing suit inviting him to swim across the lake, should he have listened to his parents and not gone in the lake? Yes. Would that be a little bit embarrassing to the manhood of a -- well, manhood, to the -- you know, masculinity the macho of a 14 year old that has to go to the -- you know, somebody invites you to go for a swim, you go, nah, no. You be the judges. But please judge accordingly and fairly.

> (Tr. Vesper closing argument, p.1302:15 to 1302:23, May 13, 2015, 352a).

The finding of negligence as to John Toribio, having been conceded during close and well demonstrated throughout the trial, was as expected.  John had been told, time and time again, not to go into the lake or pool.  There was considerable testimony by Heather Dioscon-Miller (the cabin owner who along with her husband, and at the request of her 14 year old son, was hosting John Toribio that weekend) that she continually told John and her son Anthony Diocson not to go into the lake or pool unless she or her husband were present:

> Q. And on this particular weekend when you went down, you discussed at length with the boys your rules, correct?
> A. That's correct.
> Q. And your rules were don't go in that lake or pool without me or Tim, being your husband, present; is that correct?
> A. That's correct.
> Q. And be back by curfew at 10 o'clock; is that correct?
> A. Yes, that's correct.
> Q. And you didn't just tell them once, right?
> A. No, I told them multiple times.
> Q. You just, throughout the course of the weekend, you kept repeating it, right?
> A. Yes.
> Q. I think you testified that you told them two dozen times?
> A. Could have been more.
>
> (Tr. Heather Diocson-Miller pp. 604:16 to 605:5, May 6, 2015, 197a-198a).

She also acknowledged that she had no expectation that Pine Haven would supervise the children:

> Q. And am I correct, you didn't have any expectation during this weekend or any other weekend that Pine Haven was going to supervise your children, did you?

5

A. No.

(Tr., Heather Diocson-Miller, p. 605:21 to 605:24, May 6, 2015, 198a).

While the appellant is not satisfied with the 93%-7% split which results in no monetary recovery, there is no legal basis to overturn the finding of primary negligence against the plaintiff. The testimony of Ms. Diocson-Miller that she told the boys told 20+ times not to go into the lake, coupled with a concession that she had no expectation that Pine Haven would supervise the children, were presumably considerable factors in the 93% apportionment against the appellant.

Despite the overwhelming factual basis for the jury's verdict, the appellant has cherry picked minimal comments from the 1400+ page transcript, covering eight days of trial, and attempted to paint a picture that she was not given a fair trial. A dissection of those comments well demonstrates that Judge Irenas' minimal questioning of witnesses, for the purpose of clarifying testimony, did not result in an unfair trial.

The first alleged infraction from the court was during a <u>Daubert</u> hearing on May 5, 2015. That hearing took place out of the jury's presence. In that the jury did not hear these comments, the comments cannot be utilized to suggest that they somehow impacted the jury. Of note, the <u>Daubert</u> hearing addressed the testimony of the appellant's liability expert, Homer Staves. Over the strenuous objection of the defense the trial court allowed Mr. Staves to testify. This is significant in light

6

of the appellant's assertion of partiality.  If anything, the trial court erred to the

appellant's favor in allowing the presentation of her case and regularly overruling

defense objections.

By way of example, Mr. Staves was allowed to testify as to Pine Haven's

negligence without reference to any controlling authority or standard.

> Q. The opinions that you've expressed here today, am I
> correct, you cannot turn to a single textbook that supports
> them, is that correct?
> A. Correct.
> Q. Not a single treatise, is that correct?
> A. Correct.
> Q. Not a single standard, is that correct?
> A. With the exception of the Jellystone, KOA standards but
> that are proprietary.
> Q. Jellystone and KOA, they don't even apply to this park.
> A. Right.
> Q. Would you agree with that?
> A. Right.
> Q. So if they don't apply to this park, you agree it's not a
> standard that should even be applied in this case?
> A. Well, you said there was a -- whether there was a
> standard available, and I want to make clear that, yes, there
> is a written standard, but it's not applicable to this
> campground.

(Tr. Homer A. Staves pp. 466:19-25, 467:1-21, May 6, 2015, 119a-120a).

Despite the aforementioned testimony, and a report citing no applicable

standards, the trial judge allowed Mr. Staves to testify over objection as to Pine

Haven's breach of the "industry standard" – all in the spirit of letting the jury hear

the case.  Clearly such a ruling is not consistent with a judge who is "partial to the defense".

Following the <u>Daubert</u> hearing Mr. Staves testified before the jury the following day, May 6, 2015.  The appellant asserts that during the re-direct examination of Mr. Staves (Tr. pp. 456-457, 460-461, 109a-110a, 113a-114a), the court somehow telegraphed its hostility towards the appellant's evidence.  A fair reading of the transcript does not support this contention.  The appellant initially takes issue with the court's questioning of Mr. Staves as to the supervision for children entering the lake.  Of note, this brief questioning occurred during the plaintiff's re-direct of Mr. Staves, on an issue that had been previously addressed on the initial direct and cross examination.  The questions from the court in no way suggested bias.  Rather, the court sought the witness' clarification as to whether or not adult supervision was required to enter the lake (Tr. p.460, 113a).

By asserting bias, the appellant must demonstrate that the trial judge had an "an unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess…" <u>Liteky v. United States</u>, 510 U.S. 540 (1994).  The Court went on to identify judicial actions that do not rise to the level of bias or prejudice:

> Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary

efforts at courtroom administration -- even a stern and short-tempered judge's ordinary efforts at courtroom administration -- remain immune.

Liteky, supra at 555-556:

While the trial judge was occasionally frustrated by all counsel, a fair reading of the transcript in no fashion suggests bias towards one party or the other. The questions or comments of the trial judge all fell within his role in the proceeding.  As set forth by the court in U.S. v. Malcolm, 475 F.2d 420 (9th Cir. 1973):

> The trial court is, of course, more than an umpire. It properly participates in the examining of witnesses for the purpose, among others, of clarifying the evidence, controlling the orderly presentation of the evidence, confining counsel to evidentiary rulings, and preventing undue repetition of testimony. The trial court's role is especially sensitive in a jury trial. It must be ever mindful to eschew advocacy or the appearance of advocacy.

The appellant next asserts that during the cross-examination of the defense water safety expert, Maria Bella, the trial court improperly questioned the witness. Of note, this was during the appellant's re-cross examination of the witness.  The court asked the witness as to whether the boys were told not to go in the water when there were no adults present.  The witness testified that the boys were told by Mr. Miller shortly before the drowning that they should not go into the lake.  This questioning merely sought the witness' factual understanding of what occurred. There is nothing inherent to the line of questioning that suggests bias, prejudice,

advocacy, or undue influence upon the jury.   The appellant asserts that this questioning reminded the jury of the minor decedent's comparative negligence. The negligence of John Toribio was mentioned or insinuated time and time again by defense counsel throughout the trial.   It was also conceded by the appellant during closing argument.   It is absurd to suggest that these two short questions by the trial court during the re-direct of a witness were improper, demonstrative of bias or impartiality, and somehow swayed the jury.

The appellant also takes issue with the court's questioning of Ms. Bella as to the inability to fully remove the risk of drowning in a lake.   The questioning must be considered in the full context of Ms. Bella's testimony on cross-examination. The appellant's attorney proceeded on this issue:

> Q. Okay. First step is, if you can do it feasibly, is to
> eliminate the risk. Third (sic) step is you try to lessen the
> risk?
> A. Reduce the hazard, yes, sir.
> Q. And what's the third and last risk -- yeah, risk analysis
> step?
> A. Well, you phrased them differently than I would.
> Q. Go ahead.
> A. We -- and this is -- this is not my rule, this is the
> National Safety Council's hierarchy. If possible, remove the hazard. If you
> can't remove
> the hazard, guard against the hazard, and if you can't guard
> against the hazard, then warn about the hazard.
> Q. Okay. Now, the least effective of those methods of
> either eliminating, reducing -- by the way, we're talking
> about risk or hazard of serious injury or death. So we're
> talking about serious risks.
> A. Yes, sir.

Q. All right. So the least effective of the -- of the risk
removal or hazard removal method is to put up a sign that
warns people of the risk of serious injury or death, isn't it?
A. Well, I would say that depends on the individual.
Certainly, I read signage and follow rules to the best of my
ability. I can't say that everybody does, but having operated
aquatic facilities for many, many years, I can tell you that
many people do read the rules and some people don't.
Q. Which is the least effective of risk removal?
A. Again, it would depend on the individual.
Q. All right. If you post a sign, but the risk remains and
you can -- again, feasibly and reasonably remove the risk, you
should, shouldn't you?
A. If reasonable, yes, sir.
Q. Yeah.
THE COURT: In a water facility, you can never remove
the risk of drowning.
THE WITNESS: Not entirely, no, sir.
THE COURT: Yeah, it's impossible.
THE WITNESS: Correct.
THE COURT: Somebody goes in the water, who knows,
has a cramp, has a heart attack, you can't eliminate the risk
of drowning, can you?
THE WITNESS: No, sir, not completely, although we
will do our level best.
BY MR. VESPER:
Q. And so other than, you know, filling in the lake, there
are ways of reducing the risk of drowning, aren't there?

(Tr. Maria Bella, pp.1152:16 to 1154:10, May 12, 2015, 336a-338a).

The court's questioning of Ms. Bella was a clarification on the issue at hand,

as testified to by the witness.  Ms. Bella was in the midst of explaining the safety

steps of   (1) removing water risks; (2) guarding against water risks; and,

(3) warning against water risks.  The trial court's question clarified the obvious –

the risk of drowning cannot be removed or eliminated if there is a lake at a

11

campground or elsewhere.  As one would expect, the thought of eliminating the risk of drowning was not pursued by the appellant at trial.  The thought that the trial court's two questions on this issue demonstrated bias or prejudice, or was otherwise advocacy, is not supported.

The appellant next asserts that the trial court improperly questioned Tim Miller.  Mr. Miller's testimony must also be viewed in context.  He testified that he knew he had to supervise his children while at Pine Haven.  He then offered testimony that he previously observed children in the lake who were not supervised.  The trial court sought clarification as to what he meant by unsupervised.  Mr. Miller went on to testify that he observed children in the lake without parents either in the water or in the area.  This testimony, if believed, could only be helpful to the appellant.  The true issue with the testimony is that the response provided to the trial judge was not consistent with the answer given shortly thereafter.  The court merely asked a clarifying question, seeking to define the witnesses meaning of "unsupervised".

> Q. And you understood, from both this and from what Mr.
> Jordan explained to you, that there was parenteral
> responsibility for the children while they were at Pine Haven,
> is that correct?
> A. Yes. I mean, it's a general rule of pretty much anything
> you're involved with. You're always responsible for your
> children.
> Q. You didn't think for a second that this was the type of
> campground or place that you drop your children off, and Pine
> Haven has them and you can come pick them up at the end of the

day, or you can come pick them up a week later. You didn't
have that impression for a second, did you?
A. No. It doesn't say Pine Haven day care.
Q. And your understanding of the gist of the rules included
that you had to supervise your children while they were at the
lake, is that correct?
A. Correct.
Q. And he specifically told you, during one of these two
meetings, that you are responsible for your children while
they were at the lake, is that correct?
A. Correct.
Q. I believe you indicated earlier that you've seen -- seen
children going into the lake unsupervised, is that correct?
A. There's -- on several occasions, I've witnessed that
happening.
THE COURT: You witnessed children going into the
lake without their parents being in the lake?
THE WITNESS: Correct.
THE COURT: They could have been on the shore,
though.
THE WITNESS: Correct.
THE COURT: So when you say they were unsupervised,
you mean the parents weren't in the water with them.
THE WITNESS: Correct.
THE COURT: Okay.
Q. But do you know when you saw children in the water
whether or not there were parents adjoining them on the beach
watching them?
A. Not necessarily.
Q. Okay. You don't know one way or the other, would that be
correct?
A. Yes, I do know. I know for a fact that there was parents
that children swam in the lake and they weren't at the lake.

   (Tr. Tim Miller , pp.676:4 to 677:22, May 6, 2015, 229a-230a).

 Again, the court's three brief questions on this issue hardly rise to the level

of bias, prejudice, or advocacy.

The appellant's final issue as to liability, and the questioning of the trial judge, relates to signage.  The overwhelming testimony by Mr. and Mrs. Miller, and their son Anthony, was that everyone was aware that there were no lifeguards on duty and that children under the age of 16 must be accompanied by an adult when in the water.  Pine Haven offered testimony that they had appropriate signage (consistent with applicable code) detailing these facts.  Of note, they had passed an inspection covering this issue in July 2010, the month before the drowning.  Nonetheless, the appellant took the position that signage was either not present or visible.  The court had previously ruled that the decedent's sister could not testify as to observations she made of the property nine days following the drowning (Tr. pp.753:7 to 755:15, 262a-264a).  Nonetheless, the court then allowed questioning on the issue, allowing the appellant to elicit favorable testimony that no signs were present nine days following the drowning.   Again, the testimony must be viewed in its entirety:

> Q. Odalie, how many times were you actually at Pine Haven?
> A. Twice.
> Q. All right. So you were there the evening that John
> passed away. Were you there any other times?
> A. Yes.
> Q. When?
> A. Nine days after he passed away.
> Q. Nine days after --
> MR. HERMESMANN: Same objection.
> MR. CICCOTTA: Again, signs, Your Honor.
> THE COURT: Not nine days after, I'm not going to let
> you ask.

Were you looking for signs when you were there?

THE WITNESS: No, we were there to do a memorial service.

THE COURT: Right. You weren't -- you weren't paying attention to whether there were signs anywhere, were you?

THE WITNESS: I actually was. I wanted to see if there were signs.

THE COURT: What, somebody told you about signs?

THE WITNESS: No, I just wanted to see --

THE COURT: You just thought of it on your own. You just decided you wanted to see if there were signs?

THE WITNESS: Yes.

MR. CICCOTTA: Your Honor.

THE COURT: Okay, go ahead, ask the question.

MR. HERMESMANN: But, Your Honor, I think she's also referring to nine days later, not the night of.

THE COURT: Well, I'm talking about the night of.

THE WITNESS: The night of.

THE COURT: Okay, go ahead, ask –

MR. CICCOTTA: Your Honor, Your Honor, I'd like to know what the objection actually is to her observations of whether there were signs, as Mr. Hermesmann testified.

THE COURT: No, you can ask it.

MR. CICCOTTA: Not only -- well, Your Honor, I'm going to ask her, and I would like to ask her, not only on the night that John passed away, but nine days later. I think it's absolutely relevant. She would be the fifth witness who would have an observation about signs, other than Mr. -- contrary to Mr. Jordan. She would be No. 5.

THE COURT: Ask the -- ask the question.

MR. HERMESMANN: Certainly not on the night when this happened.

Q. On the night that you went to the -- to the campsite, the night that John passed away, did you see signs anywhere near the swimming lake?

A. No.

Q. When you -- when you were there just a week later, nine days later, did you look for signs? Did you see if there were any signs anywhere near the swimming lake?

A. There were no signs.

Q. Okay. Did you see signs anywhere, anywhere in the area
pertaining to the swimming lake?
A. No.
Q. All right. Thank you.

 (Tr. Odalia Toribio, pp.753:7 to 755:15, May 7, 2015, 262a-264a).

The totality of the testimony, inclusive of the trial judge's questions, was the exact testimony that the appellant was seeking.  After the court asked the witness about viewing signs nine days later, the court then allowed the appellant's counsel to confirm this same issue – once again demonstrating that the trial judge did not have an inherent bias towards the defense.

Throughout the trial nothing was ever said or done that suggested bias  or prejudice, rose to the level of advocacy, or otherwise prevented the presentation of the appellant's evidence.  While there were exchanges with the court where both the appellant counsel, appellee counsel, and the trial judge were upset, the trial was void of any activity that prejudiced the appellant's case. Of note, the appellant never moved for a mistrial at any juncture of the trial – even after the court specifically asked if the appellant wanted a mistrial.  (Tr. 831:23 to 848, May 7, 2015, 270a-287a).

Throughout the trial the appellants offered multiple theories of liability against the defense.  Those arguments were not impeded by the trial judge. Despite those arguments the jury held that Pine Haven, while negligent, was not more at fault than John Toribio.  The negligence of John Toribio was properly

16

before the court, and it was within the province of the jury to apportion liability. While that apportionment was not favorable to the appellant, there is nothing to suggest that the trial court's questions or comments – either individually or collectively – shaped the verdict.

### POINT II:  THE DISTRICT COURT CORRECTLY CHARGED THE JURY AS TO DUTY

The appellant mistakenly asserts that the trial court failed to charge the jury on "Duty Voluntarily Assumed", MCJC 5.10C.   To invoke MCJC 5.10C, "Duty Voluntarily Assumed", the defendant must otherwise not owe a duty to the plaintiff.  For instance, a "waving driver", who otherwise has no duty to check traffic for others, has been found to have a duty to check traffic for other drivers prior to waving to another driver.  Thorne v. Miller, 317 N.J. Super. 554, 772, 722 A.2d 626 (N.J. Super. Ct. Law Div. 1998).  Likewise, while one has no duty to hold a ladder for another, once that task is assumed it must be done reasonably. Ceneviva v. Homes, No. 09-2452, 2011 U.S. Dist. LEXIS 65061 (D. N.J. June 20, 2011).  In Thorne, supra, and Ceneviva, supra, a duty would not have existed but for the action of the defendant.

In the matter sub judice, the trial court instructed that Pine Haven, as the owners of the camp ground, had a duty to John Toribio.  That is, regardless of other action that were allegedly undertaken, Pine Haven as the property owner and proprietors of a camp ground had a duty to the plaintiff – or so the jury was

instructed.  That duty, as well as the concept of negligence and proximate cause, where fully charged to the jury.  Accordingly, there was no legal basis or need for an instruction on "Duty Voluntarily Assumed".

Nonetheless, the appellant makes arguments that suggest she was precluded from having an instruction or otherwise commenting upon roving security patrols, lighting, providing security, or the industry standard (as testified to by Homer Staves over objection).  Contrary to the appellant's suggestion, all of those issues were presented to the jury by the appellant, many over defense objections.  Further, the court specifically addressed those issues during the jury charge:

> Plaintiff alleges that defendants were negligent because they failed to adopt and implement basic policies and procedures at their campground that would have made unsupervised access to the swimming lake by John Toribio on August 8th, 2010, impossible or unlikely.
>
> Plaintiffs allege that the industry standard is to provide regular employee patrols of campground areas frequented by children and teens, adequate illumination of the swimming lake to deter entry by children and teens after dusk, and proper and visible signage with appropriate warnings about use of the swimming lake by children and teens after dusk, and that defendant -- defendant's deviations from these standards directly and proximately caused John Toribio's drowning.
>
> A property owner is liable to a person who comes onto the property for harm caused by the owner's failure to exercise reasonable care in conducting an activity upon the property. The property owner owes a duty to exercise reasonable care in the conduct of activities on the premises to persons who have been invited upon or are allowed to have a right to be on the premises.

18

A person who enters a premises to purchase goods or
services from the owner or operator is deemed to have been
invited onto the property, thus, the owner must exercise
reasonable care in conducting activities on the property so as
to avoid injury to persons or invited -- or who are otherwise
allowed to have a right to be on the property.

In order to prevail on the claim against defendants,
plaintiff must prove by a preponderance of the evidence that,
one, defendant breached the duty of reasonable care that they
owed to plaintiff, and, two, that defendants breached --
there's no breach there -- the defendant proximately caused
John Toribio's fatal drowning. I will explain each of these
concepts separately.

(Tr. Jury Charge, pp.1350:10 to 1351:24, May 13, 2015, 374a-375a.

The trial court's jury charge as to duty fully encompassed all of the claims

asserted by the appellant at trial, and was consistent with New Jersey's model

charge on duty. Further, there are no facts to suggest that the jury's verdict would

have been different had they received an instruction on "Duty Voluntarily

Assumed".

## **CONCLUSION**

The minimal questioning of witnesses by the trial judge was appropriate, within his purview, did not rise to the level of bias, prejudice, or advocacy, and did not result in a miscarriage of justice. The jury's apportionment of liability was consistent with the evidence. Accordingly, it is respectfully requested that the jury's verdict be affirmed.

Respectfully submitted,

/s/ Patrick J. Hermesmann
PATRICK J. HERMESMANN
TERKOWITZ & HERMESMANN
Suite 200
309 Fellowship Road
Mount Laurel, NJ 08022
(856) 642-4012
phermesmann@hanover.com

*Counsel for Appellees*

## <u>COMBINED CERTIFICATIONS</u>

### 1.    <u>Bar Membership</u>

I hereby certify that I am admitted to and a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

### 2.    <u>Word Count</u>

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a). Specifically, this brief contains 4,928 words in 14 point Times New Roman font.

### 3.    <u>Certification of Service on Counsel</u>

I hereby certify that on June 24, 2016, I caused a copy of the foregoing Brief to be filed and served on the following counsel for Appellant, a Filing User, via the Court's ECF filing system, and 7 hard copies to be sent to the Clerk's office.

Reno J. Ciccotta
Maniaci Ciccotta & Schweizer
385 Kings Highway North
Suite 105
Cherry Hill, NJ 08034
(856) 321-9331
rciccotta@jgmlawoffice.com

Thomas J. Vesper
Westmoreland, Vesper & Quattrone
8025 Black Horse Pike
Suite 500
West Atlantic City, NJ 08232
(609) 645-1111
tjv@westmorelandvesper.com

*Counsel for Appellant*

Dennis M. Marconi
Barnaba & Marconi
315 Lowell Avenue
Trenton, NJ 08619
(609) 584-1444
dmarconi@barnaba-marconi.com

John C. Simons
Hoagland Longo Moran Dunst & Doukas
40 Paterson Street
P.O. Box 480, Room 301
New Brunswick, NJ 08903
(732) 545-4717
jsimons@hoaglandlongo.com

*Counsel for Third Parties*

### 4. <u>**Certification of Identical Compliance**</u>

I hereby certify that the text of the electronic brief is identical to the text in the paper copies.

### 5.     <u>Certification of Virus Check</u>

I hereby certify that a virus detection program has been run on the file and that no virus was detected. The version of the virus detection program used was Kaspersky version 15.0.2.361(c).

/s/ Patrick J. Hermesmann
PATRICK J. HERMESMANN
TERKOWITZ & HERMESMANN
Suite 200
309 Fellowship Road
Mount Laurel, NJ 08022
(856) 642-4012
phermesmann@hanover.com

*Counsel for Appellees*